2015-2043 Perfect Surgical Techniques v. Olympus America Mr. Freitas, am I saying your name right? Freitas. Yes, Your Honor. Please proceed. May it please the Court. This case involves a dispute about whether during a critical period extending only from February 10th to May 1st, the patent owner approved the exercise of reasonable diligence. As the cases say, the question is whether the evidence showed a reasonably continuous process toward the constructive reduction of practice through the filing of a patent application. One of my biggest concerns on this diligence issue is why didn't you submit the doctor's surgery schedule to the Court? The events took place 15 years ago, Your Honor. The records just weren't available going way back that far. Okay, so he was able to testify that he performed all these surgeries but had no ability to look at his calendar to tell us on what dates he likely performed them? So, given the time period, Your Honor, he wasn't able to provide those sort of details. However, given his practice since 1980, he's familiar with what his schedule was during those years, his teaching schedule at two of the leading medical schools, the nature of his practice. Given his status as a pioneer in some of the fields that he works in, he's had a very busy practice. I don't dispute any of that. He seems very impressive. I guess my question is, is that, you know, we've got this problem that we have case law that says, A, that the burden is on you to show that there was reasonable diligence, conception and reasonable diligence to reduce it to practice, and B, that there has to be corroboration. And so what did he have to corroborate the claim that 15 years before, he was doing surgery on virtually a daily basis? Well, one specific piece of evidence that was in the record was his CV, demonstrating that over a long period of time he didn't have his practice. And also, in the recent case law, it's clear that not every specific detail must be corroborated. The basics of his practice as a busy surgeon and a professor were well corroborated from simply from the CV, the evidence that wasn't challenged about what he had done. Did he have anybody at the hospital or anybody that worked with him in that time frame that could have provided information as to, you know, some doctors only do surgeries on Mondays. Some do them Monday, Wednesday, Friday. Some do them every day of the week. Was there anybody that could talk about the time frames during which he would be actively performing surgeries? So I don't know the specific answer to your question, Judge O'Malley, but I believe there would have been someone, a colleague, who had been working with him back then. So I think there could have been. But in the context of this case, I don't think that's particularly crucial because what we have is the fact that at the beginning of the critical period, the application was undisputedly in draft. So what we're looking at is nothing more than the completion of a draft patent application. The period is modest. There's no dispute that he was active, that he was working, that he was a busy surgeon. Well, let's just talk about the period. The period that the government found the first gap for was February 10th to March 2nd. And can you tell me precisely what was happening during that time period? I understand that March 2nd is when Dr. Neshat sent comments on the first draft of the patent application. And I also understand that on January 28th, he received that first draft. So is there anything that you can point to that was being done between February 10th, which is the day of the 551 being published, the prior art that's at issue, and March 2nd? Is there anything that you can point to? So given that the record does show that on March 2nd, the response was delivered, what the record shows is that he was working on the response. Between January 28th and March 2nd, he was working on. Do we have in the record, I found the first draft, and I found the second draft, and I found the final application. Do we have anything in here which demonstrates to me what his comments were on the first draft? Because he sent comments on the first draft. Inferentially, Your Honor, it shows by virtue of what changed. Claims were added. Drawings were added. OK, so where can I see what changed? So the first draft, I think, do you have your appendix with you, I hope? The first draft, I think, is at 582. And the second draft, I think, is at A610. Can you confirm whether I'm correct about that? Yes, Your Honor. The cover letter from Attorney Haslund appears at 579, and then the application follows. So basically, what Mr. Neshat would have been doing between January 28th and March 2nd, you're saying, is putting together comments that are what prompted the changes from the first draft to the second draft. Yes, Your Honor, except I would point out that the date is actually February 10th. That's the beginning of the critical period, or February 9th. But you don't have any, he received the first draft on January 28th. I think actually it was sent on the 29th, Your Honor. The cover letter is dated the 28th, but I think the record is it was a day later. Fine, January 29th. And he sent comments on March 2nd. So we know between receiving it and sending comments, he had to be working on those comments. Yes, Your Honor. But you don't have anything to tell me for sure he was working on them, for example, between the time period of February 10th and March 2nd, right? Because he could have, maybe he could have worked it all, maybe he got them all and worked on them all right away, and then, you know, set it aside and then turned it over to his attorney. I agree that that's conceivable, Your Honor, but the process described by Dr. Neshat and Mr. Haslund was that there was an ongoing communication between the two. There were many conversations. Dr. Neshat was a very involved client. Where does it say there were many conversations during this time period? It doesn't, Your Honor. Mr. Haslund's testimony refers to the period, the critical period as a whole, which we submit is the proper stance that should be adopted. Rather than looking on isolated pockets, the case law requires that the evidence be looked at as a whole. Therefore, it's dangerous when a focus is placed on a narrow period of time. The proper stance is to look at the entire critical period, and that's what Mr. Haslund's testimony addresses, the conversations, the involvement. Your Honor, you asked a question about where the second draft was? Let me ask you a hypothetical question. What if we were looking at a six-month time frame for this back and forth? I mean, at some point, I mean, I understand your argument to be, look, these are both busy people. The lawyer is doing stuff. The doctor is doing stuff. They both have other things they have to do, so it's still reasonable for them over a three-month period to be going back and forth. Well, at what point does the time frame in and of itself become so long that it's unreasonable? I don't think there's a fixed point, Your Honor. The basic idea of the cases is that a reasonably continuous process must be shown. When we have a period as short as this one, it's easier for us to do that. If the period is lengthened, I agree, Your Honor, that it does get more difficult for the patent owner to make its case. But we are dealing with this period. We are dealing with undisputed facts showing that the application existed at the beginning, was changed, and was finalized by May 1st. So working with this period of time, what we end up with is a circumstance where the only plausible conclusion would be that a reasonably continuous process did occur. Now, we have a problem here because the board committed a few errors in the way it looked at the evidence. First of all, it didn't look at all of the evidence. It explicitly said, we're not considering what Heslin did. It sort of said both, didn't it? At one point, it said, we're looking at all the evidence. But then at another point, it said, but we're not considering any activity by the lawyer. Well, I don't think they said they're looking, Your Honor. What they said is looking at the evidence as a whole. But the money point they made was they didn't look at what Heslin did. They said, we need not reach. So what is the evidence of what Mr. Heslin did? He was the prosecuting attorney. He reviewed drafts. He prepared drafts. He did all of the things that one would expect a prosecuting attorney to do. And the point is not to focus on something specific about what he did. But given that this is a factual inquiry, it's critical. It's a factual inquiry that we have to give substantial evidence deference to on appeal. So if we think that there wasn't something wrong with the PTO looking at gaps and saying, during this gap, was there any activity, if we think that that's not wrong, is there anything in the record, is there any evidence that would demonstrate to me that the PTO's failure to consider Mr. Heslin's activities would affect the gap that they identified, the first gap or the third gap, for example, but especially that first gap, is there any evidence in this record that Mr. Heslin was doing anything during that period such that, because I agree with you, if I read this opinion as indicating that the board refused to consider and weigh as part of the evidence what the attorney did during the period, that is troubling under our law. However, if there is no evidence in the record that the attorney did anything under a gap period, and if I think a gap period is a reasonable way for the PTO to analyze this, then does it matter? So what I'm asking you, I just want to make sure you understand why I'm asking you this and what I'm asking you, so is there any evidence that was presented that Mr. Heslin was undertaking anything at all related to this prosecution during the gap periods such that their failure to consider his actions as part of the diligence would be harmless error? In the final gap period, there clearly is, Your Honor. The final gap period runs from about April 13th to May 1st. That's when the application was filed. Obviously, Mr. Heslin was in control of things then. He did the final work. So we know that by not considering that part of the period, we know there's a problem. But wasn't that the point that the board was making, that even if we give you that period, we don't have to consider his activity because even if we give you that period, there's still these other two periods that the board felt where Dr. Nesbitt had the application in his control and things didn't happen. Well, there's only two others, Your Honor. One's a weekend, and by the way— Don't worry about that. Just talk about the first one. All right, so we have the beginning then and we have the end. At the end, Heslin's in control. But the beginning, we want to know about the beginning. That first gap is where we're trying to get you to focus. So the beginning, Your Honor, is a situation where Dr. Nesbitt is prosecuting his very first patent application. The evidence for Mr. Heslin is that Dr. Nesbitt took great pains to carefully study the application, understand it, he had a lot of questions. It's understandable that during that initial period, Dr. Nesbitt took some time. This is corroborated through Mr. Heslin's testimony that he was involved, he was careful, he was thorough. So it's understandable that during that first period of time, from the 10th to the 2nd, he was studying in the context of his busy schedule. He was trying to understand. And by March 2nd, he had his comments for his counsel. But that evidence, when you say there was evidence, it was only his own testimony, right? And Mr. Heslin's testimony that Dr. Nesbitt was an involved client, actively asking questions, thoroughly reviewing, trying to understand. Mr. Heslin testified that Dr. Nesbitt was so involved that Mr. Heslin stopped billing him for all of the calls. He said, you know, at some point, you just can't keep doing that. So there's no doubt that throughout the period, he was involved. You are well into your rebuttal time. Oh, please, go ahead. I have just one question, Mr. Freitas. This is procedural. Assume for the moment that one were to conclude that the board ruled correctly on diligence and ruled correctly on the translation issue but erred on claim construction. What would be the thing the court should do under that circumstance? I know you're not urging all of those things, but just assume hypothetically that would be a ruling. Reverse the finding of unpatentability because with the claim construction error, then we wouldn't have the problem with JP551. That would be the result we would advocate. So staying on this procedural question, if we were to find that the board applied a wrong legal standard with respect to the diligence question, given that there are underlying fact findings, would the best that you could hope for would be a remand to apply the correct legal standard? Yes, it would be, Your Honor. Under that limited scenario where the error was failure to apply the proper standard, we're not advocating that we'd be entitled to outright reversal should the court rule only on that. Has there been a ruling on conception here? No, Your Honor. If we disagreed with the board on diligence, there would have to be a ruling on conception below, correct? Yes, there would be, Your Honor. All right. Thank you, Mr. Freitas. Ms. Fishman? Ms. Fishman, why don't you please start with the procedural questions because we want to make sure that we understand what should happen in the various circumstances. I believe the first one, the one that Judge Schall asked, was what if we affirm on everything except claim construction? Then what happens? So, Your Honor, I think it depends on what you decide with respect to claim construction. And to be clear, we don't think you reach claim construction because any— Stop. Just answer my question. Right. If you decide, depending on how you decide claim construction, if the court were to read in a method of manufacture limitation into the interpretation of— Okay. You're talking way too long. This is such a simple question to answer. Say we agree with them on passages. Boom. Claim construction. Now, we agree with them on the whole exclusion of passages. Correct. Because that's their argument on construction. So if we agree with that, but yet we affirm on diligence and we affirm on translation, what happens? What he said, to make it even easier for you, is that JP551 is now no longer an issue under those circumstances because if we say the claim excludes passages, then JP551 could not have rendered unpatentable. I understand, Your Honor. That's incorrect. There were no findings that JP551 was a passage but not a perforation below. That record was not developed. What we know is that JP551 has an opening or a slit, and under any reasonable construction, whether it's a perforation or a passage, JP551 should on its face meet the limitation of the claim. Okay. But the board didn't find that, right? So I guess what we're trying to figure out is if that's the configuration that we end up in, affirming on diligence, affirming on translation, but reversing on claim construction, then do you agree that the appropriate thing to do is to vacate and remand under those circumstances? Not necessarily, Your Honor. No, because— If there's a fact-finding about whether a slit is the same thing as a perforation but not a passage, if there has to be a difference between perforations and passages, you want us to, in the first instance, decide whether a slit is a perforation on the one hand or a passage on the other. Your Honor, I guess— The tone in my voice should tell you the uncertainty with which I think your answer might fall. Okay, Your Honor. I mean, Your Honor, I think it's proper to remand. I don't think it's improper to remand, but from the face of the document itself, assuming there's no other limitation read into the claim, from the face of the document itself, under any ordinary construction of perforation or passage, J.P. 551 would satisfy it. But a passage is gone. We're assuming passage is gone. Sure. So you're saying perforation alone, as the board read what perforations were, that this slit is a perforation. Correct. Even PST's own expert conceded in deposition that a perforation is an opening. As long as a perforation is an opening, J.P. 551 disclosed it's an opening. But doesn't the board have to make this, if the case went this direction, doesn't the board have to make this determination in the first instance? Because there has been no finding. The board might well agree with your arguments or it might disagree. But we can't, I don't think we can sit here and say that if a perforation is all that there can be, that what the result is. It has to go back. I don't disagree that it would be appropriate to remand. My only, my point is if it's so clear on its face, I also But we can't, but even if it's clear on its face, it has to be clear on its face, I think, to the board. Okay. See what I'm saying? Okay, so I think I understand your argument. But let me just double check one more thing. My clerk just indicated that there are claims that don't involve the perforation limitation. Just to make sure. So even if we sent it back under perforation, there are other claims for which, if we were going to affirm what the board did vis-a-vis diligence, then we would be affirming the So you would end up with a split decision, right? We would be affirming the decision on the non-perforation claims, and we would be vacating remanding as to the perforation claims. So only two of the claims at issue below have the limitation of a perforated jaw. Okay. That's correct. All right. And also, appreciating that you understand our position, PST raised all sorts of arguments regarding a perforated jaw below, all of which were rejected by the board. It never raised an argument that a perforation should be limited, by its method of manufacture, which is what they're advocating here. So in terms of the location of a perforation, whether a perforation can release steam, whether a perforation needs to be located in a particular position on the jaw in order to release steam, whether it has to release a vapor layer or just release steam, all of those issues were presented below. All of those issues were acceded to by their expert in deposition, and ultimately the board rejected it based on their own expert's admission, finding that the slit of JP551 is capable of releasing steam, therefore it meets the limitation of the perforated jaw. So in our view, it's waived, but understanding the procedural question Your Honor has asked. I thought what he said was it meets the limitation of the perforated jaw if you assume that perforations are, that passages are a subset of perforations, which he didn't agree with. That's one interpretation of the board's final written decision. Another interpretation of that same passage is that it was based on their interpretation that as long as some steam is released by the perforated jaw, it satisfies the limitation. Yeah, but the problem is if we conclude that there is the equivalent of a disclaimer here, if we conclude that the patentee acted as his own lexicographer and said whatever perforations are, they don't include passages, then the board has to, if we conclude that, which is what they're arguing, then the board has to be wrong because passages would allow steam, and if he has expressly carved passages out of what could otherwise be perforations, then the answer can't just be anything that lets steam through is a perforation. I understand your position. Okay, so if you don't mind, would you turn to some of these diligence arguments? If I could first respond to some of the factual assertions that Mr. Freitas made. First, can we just get the weekend off the table? That was silly, right? It's ridiculous. Yes, and that was not something that we had advocated in our briefing below, but even without that period of time, in a three-month period, there are more than 72 days of unexplained inactivity. The board focuses on 39 of those days in which the application is in Dr. Najat's hands, not in Mr. Heslin's hands. That is not disputed. With respect to the facts, Your Honor, Judge O'Malley, you had asked about doesn't he need corroboration. Wait, wait, wait. You said the board focuses on periods when it's in whose hands? Dr. Najat's hands. No, but Mr. Heslin, no, the third period, I understand it to begin when Mr. Heslin sends Dr. Najat the second draft. Correct. And I understand that period to end when Mr. Heslin files the patent application. That is correct. So your statement, I think, is factually wrong, right? Because Mr. Neshat did not file the patent application. So it appears to be correct. So your statement was factually wrong that the third gap is entirely when the application was in Mr. Neshat's hands because the attorney was the one filing the application. So his actions, prompting filing, licking the envelope closed, putting the stamp on it, whatever happened, that was the attorney's actions. So the 17 days from April 14th to April 30th, there's no evidence that Dr. Neshat ever sent the application back to Mr. Heslin. Yes, but we know that Mr. Heslin did something because he filed it. Correct, on May 1st, on May 1st. So I don't understand. So in order to file something, you've got to lick an envelope. You've got to put a stamp on it. You've got to finalize it. You've got to write a check. There's all kinds of stuff you've got to do to file a patent application. I understand that, but there are no differences that we can see between the second application that was sent. I agree. I looked as well. I worded it right back and forth. There's no good red line that comes out of it. So clearly Mr. Neshat didn't offer any comments between the second draft and the final application. And importantly, there's not a single time entry reflected in Mr. Heslin's records for that period April 14th to April 30th. So your point is could it have been sent back to Mr. Heslin in the April 14th through 30th period and it have been in his possession? No, it has to have been because we know Mr. Neshat didn't file the application, correct? Correct. On May 1st, Mr. Heslin filed the application. So we know that Mr. Heslin, the attorney, and that's part of the gap period, right? No, that's not part of the gap period. That was my point, Your Honor. The gap period that the board, actually the board, the gap period is April 14th to April 30th. Heslin files on May 1st. So we don't know what happened exactly. There's no evidence of any time entry records. It could be that, I mean, it's all speculation. Perhaps he just decided to go ahead and file. Perhaps he had a phone conversation with Dr. Neshat saying, do you have any comments? I want to get this thing on file. We don't know. We don't know what happened. So the inactivity, we're presuming because nothing was ever sent back, that it was in Dr. Neshat's hands. And we don't see any evidence of activity by Mr. Heslin in that period. Mr. Heslin has no recollection beyond his time records. And his time records reflect no activity. So, of course, on May 1st he had to take some steps to do something. But May 1st isn't included in the 17-day gap after the application was sent to Dr. Neshat and before Mr. Heslin filed. You're saying the days that Mr. Heslin was active as the record supports it don't correspond to the gaps of the board? That is absolutely correct. And even days when it was in Mr. Heslin's possession and there was no activity do not correspond to the findings by the board. So when the board is making its findings about the periods of inactivity, there is evidence in the record that the application was in Dr. Neshat's possession. And that has not been contested by PST. So is it your position that he would have to show activity every single day? It is. No, that's not our position. Our position, consistent with this court's precedent, is that he would have to account for his time spent on the application essentially every day. But you don't have to get to the every day basis. I mean, that is your argument. Because you say Mulder's—I mean, the way you read Mulder is that if he even missed a day or two days, he's done. But those aren't the facts here. I don't think we have to get to that extreme. This court's precedent is that you have to— And your arguments to them are their own reading of Mulder because they did cite the two-day gap, which was a weekend, and faulted him for not acting over a weekend on it and not being able to demonstrate what he did that weekend. And so the board clearly was thinking even that two-day gap is something about which he has to be accountable. I think if there's no explanation, if there's no explanation— Do you think that if you're prosecuting a patent application, you have to show that you worked over the weekend on it? But this wasn't Heslin. This was Dr. Najat. Do you think that Dr. Najat has to show that he worked on the prosecution over a weekend? I don't think a two-day gap in a three-month critical period should be what we rise and fall on, but those aren't the facts here. The facts here are there is no—not just no corroboration. There's no direct testimony of any day in the critical period between February 10th and March 2nd when Dr. Najat worked on the application. Dr. Najat himself testified that he couldn't recall any specific day or any specific activity in that period. Well, it is 15 years later. That may be, but it's also—the burden is on the patentee if they want to swear behind prior art and to date their invention to come forward with evidence that's specific as to facts and dates. I appreciate the fact that you don't think it should—that two days over a three-month period should be enough to dam the ability to prove that they could swear behind. But what we're concerned about is that the board seemed to think that, and the board seemed to think that the law was something different than it appears to be. And so should we say, well, the board made legal errors, but they're harmless? I don't—I guess I have a different reading of the board's decision because I do not see where the board said two days is enough. I understand that they point to this period of inactivity, but they look at it collectively, and the recitation of federal circuit precedent seemed on point. And the fact of the matter is what we have here is very much like what you see in Kendall v. Searles and in Gould v. Shallow, where you've got an inventor who says and averts and even has, in those cases, other testimony saying they worked on it continuously. There were no weeks or months that they couldn't show work on it. There was oral testimony. But they never provided any evidence in terms of facts of what was done and on what dates. There's not a single date between February 10th and March 2nd that Dr. Najat can say that he was working on the patent application. Are inventors allowed to have a life or a career outside of working on the patent? Of course they are, but they need to be able to explain what it is that they're doing, why it is they set aside the application. And in cases where they decide to set aside the application because it's not their top priority or focus in life— But he clearly didn't set aside the application. Because what we do have from the record is that at the end of that period, he sent comments—because we have, what, facts, transsemblies, or something, some sort of transmission indication—that on March 2nd, 1998, he sent comments on the first draft. Then immediately afterwards, we have Mr. Heslin dictating questions about those comments to him. So clearly he was working. He did produce comments. We have no idea whether they were one page or 20 pages long, but we do know that during that period, he produced comments. So your point is well taken that he can't document on which day he reviewed the application, on which day he drafted the comments. But we know that during that period, he did them. So why isn't that enough? Why does he have to look backwards to 1998, 18 years ago, when he can establish he did do stuff during that period? Why do we force him to say, on which day did you do it? It's not just on which day did you do it, but what did you do? We don't know specifically what he did. Well, we know he produced comments. We know that those comments caused Mr. Heslin to dictate questions to go back as a follow-up on those. And what we do know, unlike the period from the second draft to the final application, where there does appear to be a single word change, we know there was an enormous number of changes between the first and second draft, because I read a lot in that one, too. Right. So we do know that there were a lot of changes between the first and second draft. And you're surmising that those changes came directly from Dr. Nejat's comments. We don't know whether it was— Mr. Heslin said that. That's in the record. He said some of the— No, in the record, he said that expressly. That is record evidence that Mr. Nejat's comments caused him to make changes to the draft. That's true, but we don't know. It's true he changed the draft. We don't know whether all of the changes in the draft were the direct result of Dr. Nejat's comments or also Mr. Heslin, including additional matter, or whether it was— Okay, so you're making very good points about the facts of this case, but I just want to step up and just question the law for a second. Yes. One of your arguments is that you have to be accountable precisely by day and time, and you find support for that argument in some language in some cases. But suppose that the facts were the critical period was five days long. At the start of the critical period, you received an application. On the fifth day, you sent 20 pages of comments to your attorney. Right. But suppose that the man says, look, I can't tell you which of the five days I did this on. I mean, I did them over a five-day period. You see, these are radically different facts than yours. Correct. But what I'm trying to get at is whether or not really we would ding an applicant for his inability to tell us upon which day he did it when there is no question he would have done it. And I know those are not the facts of this case, so don't worry. I just want to get at the legal point of are we really going to hold him accountable for a day and time stamp in circumstances in every case? Right. And so, you know, legally, precedentially, this court's law is that you can't surmise. Ireland versus Smith is you can't surmise. But it's all driven by the public policy of not only do we want to reward inventions and who's first to invent, but we want to encourage the filing of patents because we believe that it's patents that drive innovation, drive industry, and the like. So I think your question in a vacuum is very difficult to answer because if the facts of that case were that, on the whole, the inventor, the first to invent, were diligent and didn't delay patent filing and there wasn't an intervening period where somebody else came in and had started and there was actual activity in a very short period where there was a lack of diligence and there was some reason for it or you could surmise that they were working away on it. In your discretion as a judge, you may find that that still advances the public policy balance that the court seeks to set. Here, the facts are different. I mean, the facts are different. You think as a judge I have the right to decide cases based on whether I think they advance public policy interests? I think as a judge, you have the right and the board below have the right as a factual matter to determine whether or not on the whole of the evidence, Najat was reasonably diligent. And in the context of Mulder, it was not reasonable because the critical period was two days. No, actually, in the context of Mulder, what the court said in its holding was there is no evidence of any activity during a two-month period, not a two-day period, two-month period. It just so happens that two days of that two-month period were involved in the critical period. But what they really faulted them for was no evidence of any activity of any kind during two months. But there are cases, and we cited them in your brief, Your Honor, where there's a 17-day period or less, and courts rely on a much shorter period of inactivity than you find here to say there was an absence of diligence. And my point, Your Honor— I think we have your argument. Thank you very much, Ms. Fishman. We are way over time. I went about three and a half minutes over with Ms. Fishman, so let's equal out the time for Mr. Freitas. Thank you. So you can try to—you don't have to use it all, but if you want to— I'd just like to make two points, Your Honor. The first is that—we pointed this out in our brief, but Mr. Heslin did explain how his office process worked back then, and there was often— Eight days in work processing. Yes. Yeah, I know. That was reality back then. Right. The other thing is these are factual inquiries, and that's why the board's legal errors are so critical. So the board adopted the wrong stance in looking at the evidence. It didn't consider it all. It didn't look at it as a whole, and that's why we submitted it. Well, so your point—just to make sure that I understand it clearly—your point about Mr. Heslin is Mr. Heslin testified expressly— and you say this in the gray brief at page five—Mr. Heslin testified expressly that before he could file an application, he would send the final draft to work processing, and it would routinely take up to eight days— That's right. —for them to get it perfect before he could send it. And so—and he testified that that was his everyday process, and so that would explain why, at least for the third gap, it actually matters if the board refused to consider what Mr. Heslin did and looked only at what Mr. Neshat did. That legal error would actually matter. Yes, Your Honor, along with the other ones. And we say fundamentally the stance the board took was wrong in two or three critical ways that we pointed out. We think that it infected the way they looked at the evidence. It created an unrealistic approach. And so let me ask you this. Suppose that the second gap is off the table because it's just truly absurd. Suppose the third gap is sort of off the table in that Mr. Heslin testified that it would have taken him roughly eight days to process the application for submission and that I find the board erred in refusing to consider Mr. Heslin's activity during those periods. Suppose that that's the case. So then we go back to the first thing. Suppose that I think that you don't have anything on the first gap, but do you think that I should still vacate and remand because it's really the board's job in the first instance to consider the entire period overall, and once they're aware of their errors with regard to gap two and gap three, they could possibly reach a different conclusion on gap one? Yes, Your Honor. Anything further? No, Your Honor. Okay. Okay. Thank you.  Don't move. Next case.